**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

LINDA JOHNSTONE and L.D. by and through
her mother, LINDA JOHNSTONE, individually
and on behalf of a class of all persons and
entities similarly situated,
               Plaintiffs,

     v.

CROSSCOUNTRY MORTGAGE, LLC

          Defendant.

Case No. 1:22-cv-01111

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANT CROSS COUNTRY MORTGAGE LLC'S**
**MOTION TO STRIKE OR EXCLUDE SUPPLEMENTAL EXPERT DECLARATION**

## INTRODUCTION

Defendant Cross Country Mortgage LLC's motion to strike the supplemental expert declaration of Plaintiffs' expert, Aaron Woolfson, is nothing more than a contrived attempt at short-circuiting the traditional battle of the experts and at defeating class certification. Realizing that the Plaintiffs have identified and set forth a class eminently worthy of certification, rather than mount an unsuccessful attack at class certification itself, Defendant attempts to preclude certification by striking the Plaintiffs' expert report that identified the class Plaintiffs now seek to certify. The motion should therefore be denied.

## LAW AND FACTUAL BACKGROUND

Striking an expert report is appropriate when a party makes "no attempt to comply with their discovery obligations," but is otherwise is particularly inappropriate when the report merely timely supplements an existing report. *See Bentley v. Clisso*, Nos. 94-6634, 95-5020, 1996 U.S. App. LEXIS 17269, at *14 n.1 (6th Cir. June 6, 1996) (concurring) (citing *Thibeault v. Square D Co.,* 960 F.2d 239, 247 (1st Cir. 1992) (holding that precluding expert testimony is a "grave step, not to be undertaken lightly")).

The Court set January 5, 2024 for the deadline for expert reports for the Plaintiffs and March 4, 2024 as the deadline for completion of expert discovery. On the final day of class discovery, December 22, 2023, the Plaintiffs filed a motion for leave to amend the complaint to add claims for violations of the TCPA's Do Not Call Registry requirements. (ECF No. 44-2). In support of Plaintiffs' claims that the Do Not Call Registry provisions were also violated, the Plaintiffs provided an *early* and unquestionably timely expert report of Aaron Woolfson. (ECF No. 44-1).

The parties also jointly sought and were granted a motion to extend the class discovery

1

deadline from December 22, 2023 to January 21, 2024. (ECF Nos. 45, 46). The parties requested this extension because Plaintiffs were still in the process of meeting and conferring with Defendant about seeking supplementation of Defendant's production of documents. Those meet and confer efforts began December 1 and related to Defendant's failure to produce any consent evidence or the "IVR Path" column of its call records for any calls besides one of the calls to the Plaintiffs. (*See* Declaration of Jonathan P. Misny, attached hereto as Exhibit A, Exhibit 1.) As a result of those meet and confer efforts, Defendant proceeded to supplement its responses, making what it represented to be a partial production of call records with IVR Path data on December 4 followed by consent information for certain leads on December 14 and also issuing subpoenas to Five9 and Jornaya for additional information related to whether calls were prerecorded and whether class members consented. Defendant again supplemented its production of call logs and consent evidence on January 16, 2024—the day before Defendant's 30(b)6 deposition on classwide issues—which had previously been rescheduled due to Defendant's failure to produce documents. (*Id.*, ¶ 6.) Also on January 16, Defendant produced the Declaration of Craig Westhusing from Five9.[1] (*Id.*) Within two weeks, Plaintiffs produced their supplemental expert report on January 30, 2024.

Defendant did nothing for over a month until March 1, 2024—the business day before the deadline for completion of all expert discovery.  Late that afternoon, Defendant reached out to Plaintiffs to inform them for first time that it contended that Plaintiffs' supplemental expert report was untimely, but "in any event, without waiving our right to challenge its admissibility," requesting an extension of the expert discovery cutoff of 30 days. (*Id.*, Ex. 2). Plaintiffs agreed to the extension, which only Defendant needed, if Defendant would withdraw its argument that the

---

[1] The declaration is dated November 16, 2023 but it was not produced until January 16, 2024.

supplemental expert report was untimely should the motion be granted. (*Id.*)

Defendant then drafted a joint motion and sent it to Plaintiffs in the late afternoon on the day of the deadline, March 4, 2024. Plaintiffs' counsel attempted to work with Defendant on revising the joint motion until late into the night, but Defendant missed the deadline to file it, sending back revisions to Plaintiff's 8:57 pm draft at 12:07 am the next day. (*Id.*) It is unclear when Defendant believed the deadline was, but as the parties traded drafts in the evening on March 4, 2024, Defendant produced the report of its expert, Julian Ackert, despite the deadline for responsive expert reports being over a month prior on February 2, 2024. The parties' joint motion was denied in a minute entry noting that Defendant did not file it by the deadline and that there was an error in the joint motion Defendant drafted as to the Court's deadline. (ECF No. 53.)

## ARGUMENT

### A. **The amended expert report should not be considered untimely.**

The Plaintiffs submitted Mr. Woolfson's expert report on December 22, 2023, well in advance of the expert disclosure deadline on January 5, 2024. As will be explained below, the supplemental report relied upon the same expert, same dataset, and same general scope of expert testimony as in the original expert report. Thereafter, on January 30, 2024, the Plaintiffs served the supplemental report, which was merely supplemental and addressed two additional matters: *first*, whether any of the calls analyzed were pre-recorded, based on information *already present* in the first dataset along with the declaration of Craig Westhusing produced January 16, 2024; and *second*, the extent to which any of those records contained recently-produced consent evidence in the form of Jornaya IDs.

No additional impermissible class or expert discovery was requested or required by either

party as a result of this supplemental declaration. Indeed, Defendant completely ignores the fact that it had well over a month from January 30, 2024 to March 4, 2024, to depose Mr. Woolfson, present his supplemental analysis to their expert, or craft any number of discovery requests. Instead, Defendant sat on its hands and waited until the business day before the deadline to seek consent to *reopen* expert discovery for a month to do work it should have done a month prior. The Plaintiffs *agreed to Defendant's request*, but the Court denied it because of Defendant's failure to file the joint motion in time. And then, Defendant had from March 15 until the time it filed this instant motion on April 29, again over a month, to move to strike the expert report or otherwise move for reconsideration. Its only objection to the timeliness or other aspects of the supplemental report was on April 29, in the middle of the class certification and summary judgment briefing. It now complains that Plaintiffs' supplemental expert report is untimely despite having had a full opportunity to seek discovery into the supplement. If anybody is sandbagging experts here, it is the Defendant, not the other way around.

Finally, if Plaintiffs' supplemental expert report is untimely, then so is Defendant's expert report, as Defendant allowed its February 2, 2024 deadline to pass without producing a report or seeking an extension to do so.

**B. The amended expert report is unquestionably supplemental.**

As early as December 22, 2023, counsel for the Defendant had the following information by virtue of the Plaintiffs' original expert report:

- The Plaintiffs retained Mr. Woolfson as an expert to "provide structure to, and then analyze, the electronic Call Detail Records ("CDR" or "CDRs"), customer lists, and *other* associated *information* that has been, or *will be*, *provided* in this lawsuit." (ECF No. 44-1, ECF p. 2) (emphasis added).
- Mr. Woolfson's experience and *curriculum vitae* (ECF No. 44-1, ECF p. 3).
- Mr. Woolfson's experience with IVR systems (ECF No. 44-1, ECF p. 4).
- The same materials relied upon in both Declarations, with only Jornaya information produced on December 14 and Five9's declaration produced on January 16 being added.

4

(ECF No. 44-1, ECF p. 8).

- The fact that Mr. Woolfson used the TelLingua dataset (ECF No. 44-1, ECF p. 9).
- A description of Mr. Woolfson's database use and filtering criteria. (ECF No. 44-1 ECF p. 12–14).
- The process and systems used to conduct the data analysis, including the subsets of data used and eliminated in coming to the resultant call data. (ECF No. 44-1 ECF p. 15–16).

With respect to what little additional information that the Supplemental Report provided, it left counsel for the Defendant over a month to:

- Depose Mr. Woolfson on either report, which it did not do.
- Have its own expert analyze and attack Mr. Woolfson's credentials already provided, including telephony experience and specialized experience with IVR systems in particular, which its expert did not address, and which such counter expert lacks.
- Have its own expert analyze the supplemental Jornaya IDs in the record CCM_000072, which it did.
- Have its own expert analyze the waterfall and data analysis processes, which it contends are flawed because Mr. Woolfson's human analysis did not use Boolean computer logic.
- Have its own expert analyze the Five9 declaration and the process for analyzing call length, which Defendant contends do not support Mr. Woolfson's conclusion that the IVR path fields in the calling records reflect the sending of prerecorded calls.

The supplemental expert report is a timely supplementation contemplated by FED. R. CIV. P. 26. Rule 26(e) provides that parties have an ongoing *duty* to supplement their discovery disclosures and that, for expert witnesses, this duty to supplement ends at the time that the parties' Rule 26(a)(3) disclosures are due. *Hamilton v. Breg, Inc.*, No. 2:09-CV-146, 2010 WL 2889089, at *3 (S.D. Ohio July 20, 2010). This duty to supplement is all the more evident here, as Defendant was in the process of supplementing its own production throughout December and January. At the time of the expert report deadline, which Plaintiffs believed they met, Plaintiffs were waiting on Defendant to supplement its production, as they even noted in a filing on January 12, 2024 (ECF No. 47, pp. 3-4. ("Plaintiffs have not yet taken CrossCountry's 30(b)(6) deposition on classwide issues due to CrossCountry's production not being complete, as CrossCountry is still working with its vendor, Five9, to provide evidence of which calls played a pre-recorded message.") Mr. Woolfson expressly reserved the right to supplement his report as

5

such discovery proceeded, as did Mr. Ackert. The irony of the pot calling the kettle black in Mr.

Ackert's statement that he reserves "the right to supplement [his] findings if additional evidence

or information is provided to me" in his April 29th declaration is lost on the Defendant, who

takes issue with Plaintiffs for doing, at worst, the exact same thing. (ECF No. 63-5, ¶ 16).

Courts faced with Rule 26(a)(3) issues are typically called upon to determine whether a

*failure* to supplement caused "significant prejudice." *See Lewis Refrigeration Co. v. Sawyer*

*Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427, 433 (6th Cir. 1983). Counsel for Plaintiffs is

hard-pressed to find cases where courts see Rule 26(a)(3) being used *offensively* in such a

manner to *preclude* supplementation, for good reason: public policy favors and rewards timely

supplementation of expert disclosures because supplementation *minimizes* the prejudice to and

generally *benefits* the other side. *See Minnkota Power Co-op., Inc. v. Manitowoc Co.*, 669 F.2d

525, 529 (8th Cir. 1982).

Mr. Woolfson's methodology was largely same with respect to both waterfalls and

merely relied upon a newly produced declaration from Five9 and additional consent evidence

that had not been provided when he performed his original analysis. And even *if* this court were

to hold that Mr. Woolfson's analysis of the additional IVR information or consent evidence was

untimely, the proper remedy is to permit the other expert to respond to it, not to strike the report

entirely. *See, e.g.*, *River City Cap. LLP v. Clermont Cnty. Bd. of Comm'rs*, No. C-1-03-289, 2004

WL 5496272, at *3 (S.D. Ohio Dec. 10, 2004) (holding that remedy for late disclosure of

exhibits relied on by expert was to permit counter expert to respond to it).

In conducting the waterfall 2 analysis in the supplemental report, Mr. Woolfson was not

starting from a blank slate; he draw further conclusions from call records he had already looked

at. *See Hamilton*, 2010 WL 2889089 at *3. In essence, Mr. Woolfson's work was no different

from an accountant running an annual report of expenditures to two different companies based on a singular set of books and records. If Defendant has a problem with the way he did that, it had the opportunity to and has challenged it in the same way. *Cf. E.E.O.C. v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1049–50 (E.D. Tenn. 2015) (offering additional statistical analysis to rebut counter expert analysis was not a new opinion).

Given that the Defendant's own internal do not call policies and records address compliance for prerecorded messages left on voicemail systems (ECF No. 70 p. 5), and given that the Defendant has produced such recordings of prerecorded messages in discovery, Mr. Woolfson's conclusion is supported by the evidence in this case. Unlike the Defendant's expert, who merely does all manner of general computer forensics work, Mr. Woolfson's unique skills are particularly suited to the telephone issues here, which involve the question of whether or not an IVR was used to send prerecorded calls, a field that Defendant and its expert do not understand.

This case is also nothing like the litany of cases cited by the Defendant. For example, in *Medtronic Vascular, Inc. v. Abbott Cardiovascular Sys., Inc.*, No. C-06-1066PJH(EMC), 2008 WL 4601038, at *1 (N.D. Cal. Oct. 15, 2008), the defendant moved to strike an expert report that was supplemented "eleven days after the close of expert discovery," and the court nevertheless *permitted supplementation*. Supplementing an expert report is impermissible when the supplement offers completely new opinions that "threaten belatedly to send the case on a wholly different track." *Talbert v. City of Chicago*, 236 F.R.D. 415, 424 (N.D. Ill. 2006). Supplements are also impermissible if they rely on a completely different methodology than previously articulated. *See id.* Here, the expert report simply advances the case down the track articulated from day one: a TCPA class action for prerecorded calls placed to cell phones. The supplemental

report is hardly an ambush attempt or an attempt at sandbagging, and as described above, Defendant had an adequate opportunity to respond to it before the close of expert discovery.

Moreover, Rule 37(c)(1)'s exceptions are triggered here. A party may supplement an expert disclosure if the failure to disclose the information was "substantially justified" or "harmless." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Here, as described above, Plaintiffs were waiting on Defendant to supplement their production regarding the issue of which calls were prerecorded through mid-January, which Defendant did, including its production of a declaration from Five9 and other documents on January 16. Consent evidence was likewise being produced throughout December and January. *See, e.g.*, *SPS Techs., LLC v. Briles Aerospace, Inc.*, No. CV 18-9536-MWF (ASX), 2021 WL 4913509, at *9 (C.D. Cal. Sept. 8, 2021) (citing cases for the proposition that "[w]here a party's own dilatory discovery tactics are the reason that an opposing expert is required to supplement a prior opinion, courts have declined to strike those expert's supplemental reports, notwithstanding the party's inability to depose the expert on its supplemental opinions.").

And, Plaintiffs' disclosure on January 30 was completely harmless. *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) (permitting expert to supplement and elaborate on testimony at trial as harmless). The disclosure was made while the parties still had over a month to go in the expert discovery period and while Mr. Woolfson was subject to deposition, unlike in *SPS*. Plaintiffs were also willing to give Defendant whatever extension it wanted on the expert discovery deadline—Defendant just blew the deadline to file the joint motion for the extension.

**C.  The amended expert report is reliable and easily passes a *Daubert* analysis.**

There is no "definitive checklist or test" used to evaluate the reliability of proposed expert testimony. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593-94 (1993). The question, at its root, is whether the expert at issue has provided a reliable, valid, and generally accepted method for her work, or whether her approach is "junk science" akin to predicting criminality by feeling the bumps on a person's head. *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997) (Stevens, J., concurring in part)

In applying FED. R. EVID. 702 to weigh the admissibility of expert testimony, the Court serves as the gatekeeper for expert testimony by "ensuring that [it] . . . both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. Under the Rule's "flexible" inquiry, the Court's analysis is primarily concerned with a proposed expert's "principles and methodology, not on the conclusions that they generate" — instead, the Court makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593, 580.

The requirement that an expert's testimony be rooted in a "reliable foundation" is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). The Court does not take on the role of the fact-finder in assessing expert credibility; "[r]ather, vigorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Defendant's class certification and *Daubert* briefing effort obfuscates the simplicity — and, ultimately, the reliability — of Mr. Woolfson's work to identify cellular telephone numbers that were called using prerecorded messages without consent. It relentlessly and exhaustingly examines every tree in the legal forest but the best it is able to come up with is proof that the dispute as to what the IVR path means is properly subject to the battle of the experts at jury trial. Defendant's expert's problems with Mr. Woolfson's analysis should not sway this Court. Mr. Woolfson has specific knowledge of telephone systems and, in particular, IVR systems. To the extent that Defendant takes issue with Mr. Woolfson's reliance on the Five9 declaration as opposed to only relying on his own expertise to determine if prerecorded messages were used, his own specialized knowledge makes him particularly adept at determining the role of IVR systems and what they do without relying on the declaration.

As was explained in the Plaintiffs' motion and reply in support of its motion for class certification, Mr. Woolfson's opinion is not only supported by his review of the Five9 declaration, but is also supported by his own experience and a number of other facts in the record. To start with, Defendant has produced prerecorded messages it admits it used. (ECF No. 70-2 (manually filed); ECF No. 60 (manually filed).) Mr. Ackert does not mention the production of the prerecorded messages or whether or not he considered them. Accordingly, Mr. Ackert's analysis starts out on shaky footing because it takes for granted that no evidence has been produced to show that prerecorded messages were sent. His analysis is therefore not based on sufficient facts and data, let alone those which have been reliably applied, in violation of *Daubert's* second and fourth commandments.

Mr. Ackert also conducted no analysis into the differences between "call time," "billable time," "talk time," and "handle time," further demonstrating a shocking misunderstanding of the facts and data of the case. Per Five9's explanation of those fields, the latter two only begin counting after the call is assigned to a *human* agent. (ECF No. 70-3.) And Mr. Woolfson's supplemental analysis explicitly *removed* calls for which there was a 0 duration and 0 billable time, indicating that the call was not connecting to anything, including a voicemail greeting. Beyond the IVR path identified, the disposition of the calls, including whether they were sent to an answering machine but have a call and billable time consistent with prerecorded calls, further demonstrates that Mr. Woolfson's analysis used reliable principles and methods that were faithfully applied to these facts of the case.

Mr. Ackert's supplemental expert declaration at Defendant's Exhibit E presents red herrings to the Court at best and shows a shocking lack of technical expertise at worst in a contrived attempt to attempt to disqualify Mr. Woolfson. For example, the supplemental declaration is rife with impermissible legal conclusions, such as the one that "Woolfson has not filed an appropriate expert report." (ECF No. 63-5, ¶ 10). Similarly, Mr. Ackert's supplemental declaration criticizes the fact that he was not provided the "data set" relied upon for either the TelLingua analysis or for the IVR path analysis. (*Id.* at ¶ 13-14). However, as noted above, the Defendant had more than an adequate opportunity to seek production of these datasets, particularly because their *existence and use was disclosed prior to even the first expert deadline in this case*. Defendant consciously decided *not* to seek discovery on those issues or purported lack of dataset to be produced for counter-expert analysis. It cannot do so now, let alone use *its own failure to seek discovery* in this regard as a basis to strike Mr. Woolfson.

Mr. Ackert's remaining qualms with Mr. Woolfson's analysis is akin to a car mechanic

11

taking issue with a motorcycle mechanic's unfamiliarity with a car's air conditioner or a rack-and-pinion steering system. Mr. Ackert fails to explain why Mr. Woolfson should be required to explain his human analysis in terms of Boolean logic, essentially computer algebraic logic, or how that logic was necessary to conduct the waterfall analysis or explain it in human terms. (*Id.* at ¶ 11, 12). Mr. Woolfson's report makes clear his methodology, and no part of that methodology requires application of Boolean AND/OR logic. With respect to paragraph 11, Mr. Woolfson makes clear what he did: he added calls in the CCM_000071 production that were not already in the previous call records files, and then from that entire dataset, removed any calls which were not outbound calls (i.e. inbound). (ECF No. 57-4, ¶ 46).

Similarly, with respect to the supposed problems identified in paragraph 12, Mr. Woolfson took the aforementioned dataset and removed any calls from that dataset: (1) that had a zero duration and a bill time of zero (indicating that the call did not connect), and (2) also removed any calls that had a disposition indicating that the call was not connected and where there was no IVR path, thus indicating that no prerecorded message was played.

If anyone's expert credentials must be struck, it is Mr. Ackert's, as he possesses *no experience in telephone systems or analysis of telephone dialing records*, but rather has a background in general computing and digital forensics. If anyone understands "essential facts" related to IVRs, it is Mr. Woolfson. (ECF No. 57-4, ¶ 8, ¶ 8 n.6). In a particular moment of shocking tone-deafness, Defendant attempts to strike Mr. Woolfson's expert analysis on the flimsy basis that Mr. Woolfson does not "state [he] has any familiarity, much less expertise, with the Five9 dialing system." Neither does Mr. Ackert, who not only does not list anything about the Five9 dialing system in his *curriculum vitæ*, but demonstrates *no* familiarity with telephone systems of *any sort*, let alone IVR systems that are alleged to have delivered prerecorded

messages. Not only does Mr. Woolfson have extensive expertise in telephony in general, he has *invented* an IVR system programming language called Canvas, which has processed "hundreds of millions of calls."

And, to be clear and as described above, Mr. Woolfson did not simply rely on an alleged misunderstanding of Mr. Westhusing's declaration, which expressly *allowed* for the possibility that the IVR path field transmitted a prerecorded call. In addition to relying on his expertise regarding IVR systems in general, Mr. Woolfson *also* relied the calling data itself, which Five9's *own documentation* explains differentiates between and measures call times with human and non-human (i.e. prerecorded) agents. Defendant twists Mr. Westhusing's declaration to read that an IVR path field expressly *precludes* the transmission of a prerecorded call. The declaration doesn't say that; all it says is that the field depends on the customer's programming, and Defendant's 30b6 representative has been completely unable to explain how it programmed its system as described in further detail in Plaintiffs' opposition to Defendant's Motion for Summary Judgment. Even to the extent that the IVR path's meaning relies on Defendant's programming, Mr. Woolfson analyzed the same and concluded that it meant that a prerecorded call was transmitted. Mr. Ackert, who has no experience in IVR systems, is free to explain why he thinks Mr. Woolfson is wrong in this regard to the jury.

Furthermore, the Plaintiffs are unable to ascertain what problems Defendant takes with Mr. Woolfson's expert analysis of the consent data. To be clear, Mr. Woolfson analyzed the data and removed any calls for which there was a valid Jornaya ID. (ECF No. 57-4, ¶ 49). While the Defendant claims that there are 8,000 such numbers which may have erroneously not been excluded in its opposition to class certification, the Defendant has not provided any evidence or analysis whereby those assertions could be tested to ascertain the source of the error and correct

13

it. *EEOC v. R&L Carriers, Inc.*, 664 F. Supp. 3d 784, 795 (S.D. Ohio 2023) (holding that errors in data analysis like not searching for typos did not affect expert's conclusions nor render them unreliable and would be adequately addressed through cross-examination).

As explained in the Plaintiffs' motion and reply in support of their motion for class certification, with the exception of Plaintiffs, all the other class members lack Jornaya IDs. Evidence of consent with respect to the Plaintiffs, despite the presence of a Jornaya ID, was disproven, and the Plaintiffs need not prove a uniformity of factual circumstances at class certification. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552-554 (6th Cir. 2006). Plaintiffs, like all class members, provided no consent, which is a legal conclusion that is not dependent upon expert analysis. *See, e.g.*, *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 972 (N.D. Cal. 2019) (partially striking web developer expert who expressed legal opinions on ultimate issues of consent's conspicuousness, consumer fairness, and confusion). It is perplexing how Defendant claims that Mr. Woolfson did not uniformly apply his principles and methods to the facts of the case when the Plaintiffs are not required to demonstrate a uniformity of factual circumstances and particularly as the Defendant has not been able to back up its claim of some sort of erroneous inclusion of telephone numbers with Jornaya IDs in Mr. Woolfson's analysis.

Of course, it will ultimately be the Plaintiffs' job to convince the jury that it should abide by his expert analysis, but Mr. Woolfson's credentials hardly justify striking him as an expert as he unquestionably meets *Daubert's* requirements. (ECF No. 57-4, ¶¶ 5–14). Mr. Woolfson provides expert witness services regularly for both TCPA defendants and plaintiffs, and far from using "junk science" – the meat and potatoes of a *Daubert* analysis, he is recognized as a telephone industry expert. (ECF No. 57-4, ¶¶ 15–22). He has been qualified as an expert in TCPA cases, including those involving prerecorded messages. *See, e.g.*, *Lester v. Wells Fargo*

14

*Bank, NA*, No. 15-2439, 2021 U.S. Dist. LEXIS 68073, at *7 (W.D. La. Apr. 7, 2021). As explained above, Mr. Ackert has not and cannot point to any use of "junk science" when analyzing telephone records by an industry expert. A proponent of expert testimony "does not . . . carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process." *Linhares v. Buyers Prods. Co.*, Civ. No. 15-11881, 2016 WL 4599899, at *2 (D. Mass. Sept. 2, 2016) (citing case).

In sum, Mr. Ackert's issues with Mr. Woolfson's analysis speak, at most, to differing interpretations of what the IVR path means and disagreements as to how to properly process the data. As more fully articulated in Plaintiffs' opposition to summary judgment, neither Mr. Ackert, Five9, the IVR manufacturer, nor Defendant, can explain how they programmed the IVR. Mr. Woolfson's analysis shows that prerecorded calls were placed, but Mr. Ackert disagrees with that assessment based on his interpretation of the Five9 dialer manual. Defendant makes a weak-sauce showing that provides a taste of a battle of the experts that will prove useful to the jury, but little else. Defendant's criticism of Mr. Woolfson's qualifications and application of his principles and methods to the facts of the case apply with greater force to Mr. Ackert. They certainly do not justify excluding Mr. Woolfson as an expert under Rule 702.

## CONCLUSION

Defendant's motion should be denied. Mr. Woolfson's supplemental declaration is timely and he has unquestionably met *Daubert's* requirements.

15

Dated: May 13, 2024    Respectfully submitted,

**/s/ Jonathan P. Misny**
Brian K. Murphy (0070654)
Jonathan P. Misny (0090673)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murphy@mmmb.com
        misny@mmmb.com

Anthony Paronich (admitted *pro hac vice*)
Paronich Law, P.C.
350 Lincoln St, Suite 2400
Hingham, MA 02043
Phone: 617.485.0018
Fax: 508.318.8100
E-mail: anthony@paronichlaw.com

Charlotte Fernee Kelly (admitted *pro hac vice*)
Fernee Kelly Law
1228 E. 7th Ave., Suite 200
Tampa, FL 33605
Telephone: 813.315.3981
E-mail: charlotte@ferneekellylaw.com

Brian T. Giles (0072806)
The Law Offices of Brian T. Giles
1470 Apple Hill Road
Cincinnati, OH 45230
Telephone: 513.379.2715
E-mail: Brian@GilesFirm.com

*Counsel for Plaintiffs*

16

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on May 13, 2024, I electronically filed the foregoing with the Clerk of Courts via the CM/ECF System, which will send notification of such filing to all counsel of record.

<u>**/s/ Jonathan P. Misny**</u>
Jonathan P. Misny